GARFUNKEL WILD, P.C.
111 Great Neck Road
Great Neck, New York 11021
Telephone: (516) 393-2200
Telefax: (516) 466-5964
Burton S. Weston, Esq.
Phillip Khezri, Esq.

*Attorneys for Lori Lapin Jones, as*
*Temporary Receiver for Narco Freedom, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

In re:

NARCO FREEDOM, INC.,                            Chapter 11
                                                Case No. 16-10128 (Smb)


                        Debtor.

-------------------------------------------------------------x

**REPORT OF TEMPORARY RECEIVER AND STATEMENT IN SUPPORT OF**
**ENTRY OF AN ORDER AUTHORIZING THE CHAPTER 7 TRUSTEE TO**
**OPERATE THE DEBTOR'S BUSINESS AND FOR RELATED RELIEF**

Lori Lapin Jones, in her capacity as temporary receiver (the "Temporary Receiver")

of Narco Freedom Inc. (the "Debtor" or "Narco Freedom"), by her attorneys, Garfunkel

Wild, P.C., submits this report to provide background on Narco Freedom and to support an

anticipated motion by the Chapter 7 Trustee ("Trustee") for authority to operate the business

of the Debtor and for related relief.

**PRELIMINARY STATEMENT**

1.      Narco Freedom formerly operated as a healthcare and housing provider and

currently is a defendant in a criminal indictment in state court. On April 3, 2015, the United

States District Court for the Southern District of New York (the "District Court") entered an

Order ("Initial Order") [Docket No. 147][1] in United States of America vs. Narco Freedom, Inc., 14 Cv. 8593 (JGK) (the "Federal Action") appointing the Temporary Receiver. The Initial Order was amended by an Amended Order Appointing Receiver entered by the District Court on May 20, 2015 (the "Amended Receiver Order") [Docket No. 166] (Exhibit A).

2.      On December 21, 2015, the District Court entered an Order which, inter alia, authorized the Temporary Receiver to file a petition for Narco Freedom under the Bankruptcy Code (the "Authorization Order") [Docket No. 382] (Exhibit B).

3.      On September 22, 2015, the Temporary Receiver transitioned Narco Freedom's healthcare and housing operations to new providers, and, since that time, the Temporary Receiver has been engaged in post-transition and wind-down work.

4.      Narco Freedom owns a building which is currently occupied, retains a small staff of employees and hourly workers, is in the process of boxing medical records and business records for transition to storage, is required to respond to requests for medical records, is periodically redirecting after hours calls for former patients to the new providers, is working on the issuance of W-2 and 1099 forms for 2015, is facing a deadline to respond to a subpoena from the United States Attorney, and is otherwise tending to tasks associated with Narco Freedom's recent transition of its healthcare and housing operations to new providers and its wind-down.

---

[1]    Unless otherwise stated, all references to the docket refer to the Federal Action (Case number 14-08593 (JGK)).

5.    To effectuate the continued wind down of Narco Freedom, the Temporary Receiver anticipates that the Trustee will seek this Court's approval to operate the Debtor. As more fully set forth below, the Temporary Receiver supports that relief. In addition, subject to a request by the Trustee and approval of this Court, the Temporary Receiver will assist the Trustee for a brief period in the transition.[2]

## BACKGROUND

### A.    Overview of the Debtor's Prior Operations

6.    Narco Freedom is a New York not-for-profit corporation that formerly provided substance abuse and behavioral health services and housing to the poor and mentally ill.

7.    Upon the Temporary Receiver's appointment, Narco Freedom's substance abuse and behavioral health care operations consisted of four methadone maintenance treatment clinics, four substance abuse treatment clinics, three primary care/outpatient treatment clinics, one case management location and one mental health outpatient treatment clinic. These clinical operations were in the Bronx, Queens, and Brooklyn, and served over 3,000 clients. Narco Freedom's programs were regulated by the New York State Office of Alcoholism and Substance Abuse Services ("OASAS"), New York State Department of Health ("DOH") and New York State Office of Mental Health ("OMH").

8.    As part of its housing operations, Narco operated a number of residences more commonly known as "three-quarter" houses which were referred to as "Freedom Houses". At the time of the Temporary Receiver's appointment, the Freedom Houses were not licensed

---

[2] Since the Trustee will not be appointed until the petition is filed, the Temporary Receiver files this report and statement to assist the Court and the Trustee in understanding the background of this case so that a request to operate can be promptly considered.

by any government agency.    Prior to the commencement of the Federal Action, Narco

Freedom had 18 Freedom Houses which provided housing for over 1,000 individuals who

had been referred to Narco Freedom from various sources including government agencies,

hospitals, health care providers, and shelters.    Some of the residents received a monthly

housing allowance through the New York City Human Resources Administration ("HRA"),

or other forms of government assistance.    In addition to the Freedom Houses, Narco Freedom

operated three "HASA Houses" which housed approximately 80 individuals referred to

Narco by New York City's HIV/AIDS Services Administration Housing System.    In total,

Narco Freedom's housing program operated out of 21 buildings of which 20 were leased and

one is owned.

9.       According to Narco Freedom's 2013 tax return, Narco Freedom received

approximately $38 million in Medicaid reimbursement in 2013.

10.      Narco Freedom employed a workforce of approximately 400 individuals

consisting of employees and independent contractors (including per diem workers).

Approximately fifty of the employees were members of the 1199 SEIU Workers East Union.

**B.    The Federal Action /The Indictments/ Appointment of the Temporary Receiver**

11.      In October 2014, the Federal Action was commenced against Narco Freedom

by the United States of America (the "United States") alleging violations of the federal anti-

kickback statute based on allegations that Narco Freedom provided housing at the Freedom

Houses only to those individuals who agreed to attend Narco Freedom's treatment programs.

In connection with the Federal Action, the United States sought and was granted a

preliminary injunction against Narco Freedom which, among other things, prohibited Narco

Freedom from conditioning residence in the Freedom Houses on enrollment in Narco

4

Freedom drug treatment programs. The Order approving the Preliminary Injunction was entered on April 2, 2015 [Doc. No. 143] ("Preliminary Injunction Order").

12.    Separately, in October 2014, the New York State Attorney General issued an indictment against Narco Freedom and Narco Freedom's former chief executive officer and others, which included charges of receiving bribes from one of the owners of the Freedom House buildings, as well as charges of fraud and money laundering. The indictment was subsequently superseded and expanded in March 2015 to include other executives of Narco Freedom, including Narco Freedom's then existing chief executive officer and Narco Freedom's then comptroller. See The People of the State of New York v. Alan Brand, Jason Brand, Gerald Bethea, Richard Gross, Narco Freedom, Inc., Daso Development, Inc., Indictment No. 0783/2015 (Supreme Court, Bronx County) (the "Indictment"). A companion indictment was also issued in March 2015. See The People of the State of New York v. Jonathan Brand and John Cornachio, Indictment No. 0782/2015 (Supreme Court, Bronx County).

13.    Thereafter, the New York State Office of the Medicaid Inspector General ("OMIG") informed Narco Freedom that effective April 6, 2015, Narco Freedom would be excluded from participating in the New York State Medicaid Program.

14.    That prospective exclusion led to the filing of an emergency motion by the United States for the appointment of a temporary receiver. By Order dated April 3, 2015, the District Court granted the motion of the United States for the appointment of a temporary receiver and appointed Lori Lapin Jones as Temporary Receiver. The Initial Order was amended by the Amended Receiver Order. The Initial Order and Amended Receiver Order grant the Temporary Receiver the full powers of an equity receiver pursuant to 18 U.S.C.

5

§ 1345 as well as specific powers enumerated in the Initial Order and Amended Receiver Order.

## C.   Narco Freedom's Financial Difficulties

15.   Following her appointment, the Temporary Receiver worked diligently to implement protocols for compliance with the Preliminary Injunction Order and to gain an understanding of Narco Freedom's operations and finances, implement financial controls and assess Narco Freedom's financial and operational viability. According to the 2012 and 2013 tax returns, Narco Freedom's losses were over $6 million and $800,000 respectively. Narco Freedom also sustained sizeable operational losses of millions of dollars in 2014.

16.   The cash losses at the Freedom Houses were the largest drain on Narco Freedom's financial position. In exchange for occupancy at Freedom Houses, residents of the Freedom Houses assigned their housing allowances from HRA, $215 per month, to Narco Freedom. Not all occupants were eligible for this subsidy and among those who were eligible, not all took the required steps to ensure continuity of this payment from HRA. The leases for the Freedom Houses were "triple net" and appeared to be above market. Thus, the Freedom Houses generated significantly insufficient income to cover costs associated with their ongoing operations.

17.   Prior to the Temporary Receiver's appointment, on March 24, 2015, OMIG informed Narco Freedom that a fifty percent withhold had been placed on Narco Freedom's prospective Medicaid payments. Upon her appointment, the Temporary Receiver obtained a reversal of the 50% withhold. In addition, the prospective exclusion from Medicaid (that was to become effective on April 6, 2015) was not implemented. There remains approximately $2.6 million in previously "withheld" Medicaid funds which New York State declined to release. The

6

Temporary Receiver is informed that the request to withhold funds was made by the New York State Medicaid Fraud Control Unit ("MFCU").

18.    The Temporary Receiver met with not-for-profit organizations to discuss potential options and exit strategies for Narco Freedom. Ultimately, the Temporary Receiver retained, with District Court approval, Samaritan Village, Inc. ("Samaritan"), a not-for-profit agency providing behavioral and housing services, to assist the Temporary Receiver in assessing and formulating an exit strategy for Narco Freedom's housing and clinical programs.

19.    Samaritan conducted an assessment of Narco Freedom's housing programs and occupants, its existing facilities, its clinical operations and its finances and was assisted by two architectural and engineering firms. Samaritan conducted walk-through inspections of the Freedom Houses, conferred with representatives of New York City and New York State government oversight agencies, met with the United States Attorney's office, met with Narco Freedom's management team, program directors and key operational and clinical staff, as well as the Temporary Receiver, and analyzed Narco Freedom's clinical operations, and its financial performance, staffing and clients. Samaritan issued a written report of its findings and conclusions [Docket No. 185].

## D.    The Stabilization Plan

20.    Thereafter, the Temporary Receiver filed a motion with the District Court for approval to implement a short term plan which focused on stabilizing Narco Freedom's operations and finances by effectuating certain emergency and preliminary measures (the "Stabilization Plan"). The Stabilization Plan was intended to provide a runway for implementation of a long term plan to transition Narco Freedom's programs and operations

to new providers (the "Transition Plan"). On July 17, 2015, the District Court entered an

Order approving the Stabilization Plan [Docket No. 206].

21.     Pursuant to the Stabilization Plan, the Temporary Receiver took certain

preliminary steps towards the ultimate transition of Narco Freedom's operations:

(a)     *Conversion of Freedom Houses to Supported Living Residences.* In an effort to
        inject additional funding into Narco Freedom and render the Freedom Houses
        more attractive to new providers, the Temporary Receiver sought approval from
        OASAS to certify the Freedom Houses as Supported Living Residences
        ("SLRs"). This certification would provide an enhanced housing allowance of
        over $1,000 per month for each qualified resident. On July 28, 2015, OASAS
        granted the Temporary Receiver's application and issued emergency certificates
        for SLRs for each of the Freedom Houses for 120 days.

(b)     *Suspension of New Admissions.* The Temporary Receiver suspended new
        admissions to the Freedom Houses. However, Narco Freedom was not permitted
        to close Freedom Houses.

(c)     *Expense Reductions.* The Temporary Receiver continued to reduce expenses in
        various aspects of Narco Freedom's operations.

(d)     *Termination Notices to Workforce.* The Temporary Receiver issued termination
        notices to all of Narco Freedom's employees pursuant to the Worker Adjustment
        and Retraining Notification (WARN) Act which provided that September 21,
        2015 would be the last date of employment.

**E.     The Transition Plan**

22.     Prior to and during implementation of the Stabilization Plan, the Temporary

Receiver identified not-for-profit providers willing to assume substantially all of Narco

Freedom's clinical and housing operations. While the methadone maintenance treatment

programs were attractive to providers, a central challenge was transitioning the Freedom

Houses which were a financial drain. Thus, the Temporary Receiver and OASAS wanted to

ensure that providers interested in assuming the clinical operations would also assume the

8

Freedom Houses. The Temporary Receiver was also interested in new providers offering employment to Narco Freedom employees.

23.     On August 24, 2015, the Temporary Receiver filed a motion to approve the Transition Plan [Docket No. 238] which proposed to transition substantially all of Narco Freedom's clinical and housing operations to two not-for-profit providers. Narco Freedom's clinics, Freedom Houses and HASA Houses that were located in Manhattan and the Bronx were proposed to be transitioned to Samaritan. Clinics and Freedom Houses located in Brooklyn were proposed to be transitioned to Acacia Network or its designated affiliates ("Acacia" and together with Samaritan, the "New Providers"). The Temporary Receiver facilitated negotiations among the New Providers, the State, and City, as well as between Acacia and the 1199 Union.

24.     On September 11, 2015, the District Court entered an Order approving the Transition Plan [Docket No. 250].

25.     Extensive work was performed by the Temporary Receiver on an expedited basis in connection with the transition which included with respect to each clinic: (a) preparation of a written transition plan for the governing regulatory agency (i.e., OASAS, DOH, or OMH); (b) preparation of notices to patients; (c) preparation of third party notices (i.e., government agencies, community); and (d) communications with the applicable governmental regulatory agency on all aspects of the transition plan. Regulatory approvals of the transitions were timely obtained. On September 22, 2015, the Clinics, Freedom Houses, and HASA Houses were transitioned to the New Providers [Docket No. 262].

26.    The Transition Plan also included closure of three clinics in Long Island City,

Queens. To this end, the Temporary Receiver prepared and obtained approval of closure

plans for these three clinics from OASAS and DOH. The closure plans addressed such issues

as: patient notification; availability of services at other locations with other providers; patient

access to medical records; preservation of medical records; proper disposition of controlled

substances; and proper disposition of hazardous medical materials.    Thereafter, the

Temporary Receiver implemented the closure plans.

27.    Narco Freedom's final payroll prior to the transition of its operations

consisted of approximately 360 employees. The New Providers informed the Temporary

Receiver that they made offers to over 330 of Narco Freedom's employees.

**F.    Post-Transition Events**

28.    Following the transition, the Temporary Receiver worked to wind down

Narco Freedom's outstanding affairs. The Temporary Receiver retained a limited transition

staff to assist her in the post-transition and wind-down work.

29.    The Temporary Receiver's post-transition work has included: issuing last

payroll; obtaining District Court approval to pay up to eight weeks' vacation pay to former

employees and issuing those payments; final billings; performing methadone inventory

counts; evaluating IT issues; vacating headquarters; entering into surrender agreements with

landlords; turning over original operating certificates to regulatory agencies; coordinating the

transition of a billing services agreement to Acacia; selling two vehicles; and addressing

records retention.    In addition, the Temporary Receiver communicated regularly with the

New Providers concerning: final Medicaid billings; collection and allocation of funds from

HRA for the Supported Living Residences for the month during the transition; landlords,

vendors, utilities; personal property disposition; and miscellaneous other issues that arose relating to the transition.

30.    The Temporary Receiver also began to address plans for the retention of medical records and business records. The Temporary Receiver entered into a Medical Records Custody Agreement with Acacia for those records that relate to clients taken over by Acacia. Similarly, the Temporary Receiver entered into a Medical Records Custody Agreement with Samaritan with respect to the medical records of clients at the sites Samaritan took over. The Temporary Receiver obtained quotes for the storage and retention of the balance of the medical records (i.e. clients that were not active at transition) and the business records of Narco Freedom. To date, the Temporary Receiver has arranged for more than 2000 boxes of documents to be stored, which was necessary as Narco Freedom had to vacate various premises. That work was in progress as of the petition date. The Temporary Receiver also had Narco Freedom's computer consultants evaluate electronic mail retention and preservation.

31.    Narco Freedom owns one building located at 2640 Third Avenue, Bronx, New York. That building was used in part as a Freedom House, which was then certified as a Supportive Living Residence and is currently run by Samaritan. The Temporary Receiver is informed that Samaritan is due to vacate the building by the end of February 2016.

32.    The Temporary Receiver also met with MFCU to address the Indictment against Narco Freedom and retained, with approval of the District Court, Morvillo LLP to represent Narco Freedom in connection with the Indictment. Currently there is a motion deadline in early March in the criminal case.

33.   On December 18, 2015, Narco Freedom was served with a Civil Investigative Demand by the United States Attorney (SDNY).   The Temporary Receiver has been communicating closely and regularly with the United States Attorney regarding the production of emails.   To this end, the Temporary Receiver obtained approval from the District Court to pay a computer consultant up to $15,000 to assist in email retrieval for the production.   The Temporary Receiver expects to be in the process of reviewing and producing emails for production to the United States Attorney at the time this bankruptcy case is filed.

### G.   Authority to File for Bankruptcy

34.   The Temporary Receiver determined that a bankruptcy filing would be the best way to complete the wind-down of Narco Freedom's affairs, effectuate liquidation of Narco Freedom's remaining assets, provide an orderly distribution to its creditors, and investigate and pursue any claims the estate may have.   On November 23, 2015, the Temporary Receiver filed a motion seeking authority to file a petition on behalf of Narco Freedom under Title 11 of the United States Code [Doc. No. 350], which was granted by the Authorization Order entered on December 21, 2015 [Doc No. 383].[3]

### NECESSITY FOR AN OPERATING ORDER UNDER SECTION 721 OF THE BANKRUPTCY CODE AND FOR RELATED RELIEF

### I.   Authorizing the Trustee to Operate

35.   The Temporary Receiver anticipates that the Trustee will see authorization to operate under section 721 of the Bankruptcy Code.   The Temporary Receiver believes such relief is appropriate to allow the Trustee to perform necessary wind-down tasks including,

---

[3] These facts are intended to provide an overview of Narco Freedom and the work performed by the Temporary Receiver.  Detailed reports were filed by the Temporary Receiver on a monthly basis and are on the docket in the Federal Action.

but not limited to, those set forth below. As of the petition date, there is in excess of $2.8 million in unencumbered and unrestricted funds in the estate.[4]

A.    **Building Maintenance**

36.    The Debtor owns real property located at 2640 Third Avenue, Bronx, NY (the "Property"). The Property is a significant asset of the Debtor having been recently appraised at $5.94 million against which is a mortgage with a balance of approximately $1.2 million.

37.    The Property is currently utilized by Samaritan as an OASAS certified Supported Living Residence (for which Samaritan pays Narco Freedom $30,000 monthly). It is expected that Samaritan will vacate the Property at the end of February 2016. Emergency repairs were recently needed for the elevator at the Property and it is expected that a Trustee will need to pay for utilities, maintenance and repairs.

B.    **Records**

38.    Following the transfer of the Debtor's operations to the New Providers, Narco Freedom retained certain medical records which were not transitioned to the New Providers (the "Medical Records"). The Temporary Receiver is the contact person on Narco Freedom's website for medical records requests and, with the assistance of staff, has responded to requests for Medical Records.

39.    The Temporary Receiver also continues to pay a call service (and a former employee) for taking ongoing calls from medical facilities seeking dosage information for Narco Freedom's former methadone patients. Health facilities still list Narco Freedom as the

---

[4] In addition to the $2.8 million, there are funds in two restricted accounts. One account was funded for the fees and expenses of the Temporary Receiver and her counsel. One account was funded for vacation pay for certain former executives the payment of which has been the subject of litigation in the District Court. [Docket No. 383]. Both accounts are governed by orders of the District Court.

contact organization for Narco Freedom's former patients and the Temporary Receiver has been working to direct the calls to the New Providers.

40.    The Temporary Receiver was in the process of developing a plan for the storage and retention of remaining Medical Records.    The Temporary Receiver has agreements in place with the New Providers to serve as medical records custodians for medical records of patients that were active at the time of the transition.    The Temporary Receiver has selected a medical records custodian to retain, index, and administer the balance of medical records, and to store business and electronic records. The Temporary Receiver has received a preliminary price quote for such services. The Temporary Receiver has paid certain storage and transportation costs as was needed when Narco Freedom had to vacate premises.    A Trustee will need to continue to pay these costs, as well as address a comprehensive records retention plan.

**C.    Authorization to Respond to Civil Investigative Demand**

41.    As part of an ongoing investigation, the United States Attorney served a Civil Investigative Demand on Narco Freedom which had an initial response deadline in December 2015 (the "Subpoena"). The Temporary Receiver and the United States have communicated extensively regarding the Subpoena and the United States has agreed to accept a defined group of emails for an initial production.

42.    In order to retrieve, isolate, index, and put the emails in a searchable format so as to permit a privilege search and response to the Subpoena, the Temporary Receiver obtained authority from the District Court to pay KDT Solutions ("KDT") up to $15,000 (of which $10,000 has been paid) to assist the Temporary Receiver [Docket No. 391].

43.     The Temporary Receiver expects that in January 2016 Narco Freedom will be in the process of turning over emails to the United States or reviewing emails for privilege. Subject to approval of this Court and the Trustee, the Temporary Receiver will to continue that work and make reasonable efforts to complete the production by January 31, 2016. The Trustee may need to expend additional funds in connection with complying with the Subpoena.

**D.     Issuance of Form W-2s and Form 1099s for 2015**

44.     Narco Freedom is required to issue Form W-2s and Form 1099s for the 2015 calendar year by January 31, 2016. The Temporary Receiver's limited staff is in the process of preparing or reviewing these forms. Continuing expenses will be incurred in connection with completing this task.

**E.     Continuation of Employees and Per Diem and Hourly Workers**

45.     After the transition of Narco Freedom's clinics and housing programs, the Temporary Receiver maintained several employees and per diem and hourly workers who are assisting the Temporary Receiver with the wind-down. These individuals are essential to performing the wind-down work and are currently working on matters such as: boxing records, responding to medical requests, preparing Form 1099's, pursuing grant receivables, opening and redirecting mail, addressing IT issues, and other miscellaneous wind-down tasks.

46.     Currently, there are three part time employees (who work on a W-2 basis) and approximately ten individuals who work per diem or hourly (on a 1099 basis). These individuals have been paid through January 15, 2016. The Temporary Receiver believes the

Trustee will need the assistance of some or all these individuals to continue with ongoing wind down tasks.

F.    **Other Expenses**

47.    Outlined above are the primary expenses that the Temporary Receiver expects the Trustee will need to incur and pay and the immediate work that the Trustee will need to perform in connection with the wind down. Undoubtedly there will be other miscellaneous expenses. The identification and discussion of specific expenses is intended to provide the Court an overview of anticipated disbursements and is no way intended to suggest that a Trustee should be limited in the expenses he or she will need to incur and pay.

II.    **Continuation of and Compensation for the Temporary Receiver and Her Counsel**

48.    The Trustee may request the immediate continued services of the Temporary Receiver and her counsel for a brief time to ensure a seamless transition. Set forth below is a description of the current compensation arrangements.

49.    The Temporary Receiver's compensation has been governed by orders of the District Court. The Temporary Receiver charges at an hourly rate of $550[5] and agreed to cap her monthly fees at $35,000 (April 2015), $45,000 (May 2015 – November 2015) and $30,000 (December 2015). On a monthly basis, the Temporary Receiver submits her time records to the United States Attorney's Office for approval and then to the District Court. Fees through December 2015 (which often fell below the cap) have been approved by the District Court and paid. Out-of-pocket disbursements (which have been minimal) have also been billed, approved and paid on a monthly basis. To the extent the Trustee requests the

---

[5] During months in which the Temporary Receiver's fees were below an agreed cap, she voluntarily reduced her hourly rate by 10%. Travel time has been billed at 50%.

assistance of the Temporary Receiver, the Temporary Receiver proposes that her compensation continue at the existing rate.

50.     Garfunkel Wild P.C. ("GW") was approved by the District Court to serve as the Temporary Receiver's attorneys [Docket No. 150]. GW has discounted its rates by 10% and has also agreed to monthly caps ($100,000 monthly through November 2015[6] and $70,000 for December 2015). GW submits fee applications on a monthly basis to the Temporary Receiver and then to the United States Attorney's Office before filing with the District Court. Fees and out-of-pocket disbursements have been awarded by the District Court and paid to GW through November 2015. It is anticipated that GW's services will be required to advise the Temporary Receiver and, as set forth more fully below, it was contemplated that GW would continue to advise the Temporary Receiver. The Temporary Receiver proposes that GW's compensation rates continue at the existing rates approved by the District Court during the brief transition period. In the event the Trustee seeks to retain GW to represent the Trustee in discrete matters, GW's retention will be subject to a separate application by the Trustee and separate order of this Court.

51.     Since the inception of her appointment, and with approval of the District Court, the Temporary Receiver has maintained a segregated account ("Receiver Fee Account") which was funded monthly to pay the Temporary Receiver and her attorneys. The Authorization Order provided that the Temporary Receiver was authorized to fund the Receiver Fee Account in the amount of $200,000 to cover the fees and expenses of the Temporary Receiver and her attorneys for January 2016 as well as to cover other costs such as filing fees and tail insurance. The Authorization Order provides that payments from the

---

[6] The District Court awarded GW fees in excess of the monthly cap twice.

Receivership Fee Account for pre-filing fees and expenses (and payments in connection with the discharge of the Temporary Receiver) shall be made by Order of the District Court and payments for post-filing fees and expenses (not related to the discharge of the Temporary Receiver) shall be made by Order of the Bankruptcy Court.

52.    The Temporary Receiver also retained Wenig Saltiel LLP (as landlord/tenant counsel) [Docket No. 156] and Smith & Downey PA (as employment and employee benefits counsel) [Docket No. 160]. These firms were paid similar to how "ordinary course professionals" are paid in Chapter 11 cases – fee applications were not required and the Temporary Receiver paid these firms monthly but only within pre-approved caps. Both firms have discounted their rates.[7] The Temporary Receiver believes the Trustee may need to consult with these firms during the transition period.  Subject to request by the Trustee, the Temporary Receiver believes it would be efficient to authorize the Trustee to pay these firms up to $5,000 each without further Order of this Court.[8]  If the Trustee seeks to retain these firms for work following the brief transition, any such retention will be by separate application and further order of this Court.

### LEGAL BASIS FOR THE POSITION OF THE TEMPORARY RECEIVER

A.    **Authorization for the Trustee to Operate is in the Best Interest of the Estate**

53.    A Court "may authorize the trustee to operate the business of the debtor for a limited period, if such operation is in the best interests of the estate and consistent with the orderly liquidation of the estate." 11 U.S.C. § 721. Courts have regularly authorized Chapter 7 Trustees to operate. See, e.g., In re Budget Travel, 12-14815-ALG (Bankr. S.D.N.Y.,

---

[7] Wenig Saltiel LLP has capped its hourly rate at $300.00. Smith Downey PA has agreed to a 20% discount of its hourly rates.

[8] As of December 31, 2015, Smith & Downey PA held a retainer of approximately $4,000.

18

March 22, 2013); In re Probulk Inc., et al., 09-14014-ALG (Bankr. S.D.N.Y., June 25, 2009);

In re Interep National Radio Sales, Inc., et al., 08-11079-RDD (Bankr. S.D.N.Y., October 30,

2008).

54.    As set forth above, there are numerous important wind-down tasks in

progress. The Temporary Receiver believes the Trustee will need to continue those tasks to

comply with applicable law and effect an orderly liquidation. There should be no question

that authority for the Trustee to operate in this case under section 721 is both necessary and

appropriate.

**B.    Continuation of the Temporary Receiver and Her Counsel During the
Transition Period**

55.    The filing of a Chapter 7 petition creates an estate and renders the appointed

trustee the representative of the estate with extensive powers. 11 U.S.C. §§ 323, 541 and 704.

See Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343 (1985).    The

Temporary Receiver does not seek to usurp the Trustee's role, but recognizes that the Trustee

may seek assistance from the Temporary Receiver during the transition period.

56.    Unlike cases where a Chapter 11 debtor in possession transitions to a Chapter

7 trustee or a prepetition entity becomes a Chapter 7 debtor, here, a unique situation is

presented whereby a pre-petition Court-appointed fiduciary who has filed the case is seeking

to transition to a post-petition fiduciary. Accordingly, the Trustee and the estate may benefit

from the assistance and advice of the Temporary Receiver and her counsel. To the extent the

Trustee seeks such assistance, then the order authorizing the Trustee to operate should

contain express authorization for the Temporary Receiver to continue briefly for the purpose

of assisting the Trustee.

57.    Of particular note is that the Temporary Receiver is in the process of responding to the Subpoena, and Narco Freedom has already obtained extensions of the compliance deadline.    It appears both logical and efficient for the Temporary Receiver to continue that work through the transition period.

58.    The Temporary Receiver expects to file a motion in the District Court in February 2016 to be discharged as Temporary Receiver.

Dated:  January 19, 2016
       Great Neck, New York

                    GARFUNKEL WILD, P.C.
                    Attorneys for Lori Lapin Jones, as Temporary
                    Receiver for Narco Freedom, Inc.

                    By: /s/ Burton S. Weston
                    Burton S. Weston
                    Phillip Khezri

                    111 Great Neck Road
                    Great Neck, New York 11021
                    Telephone: (516) 393-2200

**EXHIBIT A**

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _5/20/2015_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                    Plaintiff,                                    14-cv-08593 (JGK)

        -against –

NARCO FREEDOM, INC.,                                    **AMENDED ORDER**
                                                        **APPOINTING RECEIVER**

                    Defendant.

**JOHN G. KOELTL, District Judge:**

        Whereas, on March 19, 2014, the United States of America (the "Government") filed a

motion for appointment of a temporary receiver for Narco Freedom, Inc. ("Narco Freedom"); and

        Whereas, the Court has considered the motion and all objections thereto and, concluded

that the appointment for a temporary receiver is necessary and appropriate pursuant to 18 U.S.C. §

1345 to prevent injury to individuals receiving health care, housing or other services from Narco

Freedom and entered an Order dated April 3, 2015 (the "April 3 Order") appointing a temporary

receiver (the "Receiver") for Narco Freedom; and

        Whereas, the Court hereby amends the April 3 Order as set forth herein.

Upon further consideration, IT IS HEREBY ORDERED THAT:

        **I.        APPOINTMENT OF RECEIVER AND DUTIES**

        1.        Lori Lapin Jones is appointed as Receiver for Narco Freedom with the full power of

an equity receiver under 18 U.S.C. § 1345 as well as such powers as are enumerated herein as of

the date of this Order. The Receiver is hereby ordered to timely and faithfully abide by and

perform the duties set forth in the April 3 Order, as may be amended by the terms of this Order.

Except for an act of willful malfeasance or gross negligence, the Receiver shall not be liable for

any loss, damage or shortfall incurred by Narco Freedom, or any of Narco Freedom's clients or associates, or their subsidiaries or affiliates, their current or former officers, directors, agents, and employees, or by any of Narco Freedom's creditors or equity holders because of any act performed or not performed by the Receiver or her agents or assigns in connection with the discharge of her duties and responsibilities hereunder. No person or entity may commence an action against the Receiver in connection with Narco Freedom including or relating to the discharge of her duties and responsibilities hereunder without first obtaining the entry of an Order of this Court, on notice to the Receiver and the United States Attorney's Office for the Southern District of New York.

2.    Until further Order of this Court, the Receiver is authorized to immediately take and have complete and exclusive control, possession and custody of Narco Freedom and to any assets traceable to assets owned by Narco Freedom.

3.    As of the date of the April 3 Order, the Receiver is authorized to perform the following duties:

a.    Maintain full control of Narco Freedom with the power to retain or remove, as the Receiver deems necessary or advisable, any officer, member, director, independent contractor, employee, or agent of Narco Freedom, but should, to the extent financially feasible and appropriate, preserve the experienced management staff and, unless exigent circumstances warrant, should not adopt any abrupt or wholesale changes to the structure of Narco Freedom without prior approval of the Court;

b.    Collect, marshal and take custody, control and possession of all the funds, accounts, mail, and other assets traceable to assets owned or controlled by Narco Freedom, wherever situated, income and profit therefrom, and all

sums of money now or hereafter due or owing to Narco Freedom with full power to collect, receive, compromise, modify and take possession of, without limitation, all goods, chattel, rights, credits, monies, effects, lands, leases, books and records, work papers, records of account, including computer-maintained information, contracts, financial records, monies on hand in banks and other financial institutions, including safety deposit boxes and other papers and documents of other individuals, partnerships, or corporations whose interests are now held, by or under the direction, possession, custody, or control of Narco Freedom;

c.      Manage Narco Freedom and its operations;

d.      Collect income and, provided there are sufficient funds, pay expenses, including payroll and payroll related items (for current employees who are actually working for Narco Freedom), as the Receiver believes are necessary and appropriate for the continued operation of Narco Freedom;

e.      Transition any unlawful or unlicensed Narco Freedom operations, such as its Freedom Houses, into lawful operations, dissolve or wind down any such operation in an orderly manner (as is feasible under the circumstances) and in coordination with governmental agencies;

f.      Obtain, by presentation of this Order, documents, information, emails, books, records, accounts, depositions, testimony, or other information within the possession, custody or control of any person or entity sufficient to identify assets, accounts, properties, liabilities, causes of action, or employees of Narco Freedom. The attendance of a person or entity for

examination and/or production of documents may be compelled in a manner provided by Fed. R. Civ. P. 45, or as provided under the laws of any foreign country where such documents, books, records, accounts, deposits or testimony may be located;

g.    Without breaching the peace, and if necessary, with the assistance of local peace officers or United States marshals, to enter and secure any Narco Freedom's premises, wherever located or situated, in order to take possession, custody or control of, or to identify the location or existence of Narco Freedom assets or records;

h.    Make such ordinary and necessary payments, distributions and disbursements as the Receiver deems advisable or proper for the marshaling, maintenance, or preservation of Narco Freedom. The Receiver is further authorized to contract and negotiate with any claimants against Narco Freedom (including, without limitation, creditors and landlords) for the purpose of compromising or settling any claim;

i.    Enter into such agreements in connection with the administration of Narco Freedom including, but not limited to, the retention of such managers, agents, custodians, consultants, investigators, attorneys or accountants (collectively, the "Professionals") as the Receiver deems necessary to perform the duties set forth in this Order, and compensate these Professionals from the Receivership assets, provided, however, that the retention of any such outside Professional is subject to Court approval if the expense exceeds $10,000.00.

j.    Promptly provide the United States Attorney's Office and other governmental agencies with all information and documentation required in connection with their regulatory and investigatory activities related to Narco Freedom and their respective officers, agents, and employees;

k.    Prepare and submit reports as requested by the Court; and

l.    Initiate administrative or legal proceedings for the benefit of Narco Freedom, including any action to recover any monies or other assets improperly paid or to avoid any transaction, contract or agreement under applicable statute, law or regulation and have full authority to represent Narco Freedom in the pursuit of such claims.

4.    The Receiver (or her nominee who is designated in writing by the Receiver) shall have control over, and be added as the sole authorized signatory for all accounts in receivership, including all accounts, wherever located or situated, at any bank, title company, escrow agent, or financial institution which has possession, custody or control of any assets or funds.

## II.    **RESTRAINT**

5.    Narco Freedom, its respective officers, agents, and employees and all persons in active concert or participation with it who receive notice of this Order by personal service or otherwise, including, but not limited to, any financial institution are hereby ordered, restrained, and enjoined from, directly or indirectly, making any payment or expenditure of any Narco Freedom assets that are owned by Narco Freedom or in the actual or constructive possession of any entity directly or indirectly owned or controlled or under common control with Narco Freedom, or effecting any sale, gift, assignment, transfer, conveyance, encumbrance, disbursement, dissipation, or concealment of such assets. A copy of this Order may be served on any bank, or any

other financial or depository institution to restrain and enjoin such institution from disbursing any of Narco Freedom's assets. Upon presentment of this Order, all persons, including financial institutions, shall provide account balance information, transaction histories, all account records, bank statements and cancelled checks, wire transaction log(s), wire transfer information, and any other records requested by the Receiver or her agents, in the same manner as they would be provided were the Receiver the signatory on the account.

6.      Narco Freedom, its respective officers, agents, and employees and all persons in active concert or participation with it, including any financial institution, who receive actual notice of this Order, shall cooperate with the Receiver and her agents by promptly and honestly responding to all requests for information regarding Receivership assets and records by promptly acknowledging to third parties the Receiver's authority to act on behalf of Narco Freedom and by providing such authorization, signatures, releases, access as the Receiver or her duly authorized agents or representatives may reasonably request.

7.      Narco Freedom, their respective officers, agents, and employees and all persons in active concert or participation with them, including any financial institution who receives notice of this Order, shall cooperate with the Receiver and her agents by providing them access to assets, records, monies, property of any kind, real or personal, including all keys, passwords, entry codes, computer systems, camera systems, wherever situated, as the Receiver or her duly authorized agent or representative may reasonably request.

8.      Narco Freedom, their respective officers, agents, and employees and all persons in active concert or participation with them are hereby enjoined from doing any act or thing whatsoever to interfere with the Receiver's taking control, possession, or management of Narco Freedom, or to in any way interfere with the Receiver, or to harass or interfere with the duties of

the Receiver, including the filing or prosecuting of any actions against the Receiver, except this

Order does not interfere with any appellate rights that anyone may have.

### III.   STAY OF ACTIONS

9.      Except by leave of this Court for good cause shown, on notice to the Receiver and

the United States Attorney's Office, during the pendency of the Receivership through and

including July 31, 2015, all vendors, principals, investors, creditors, stockholders, lessors and all

other persons or entities seeking to establish or enforce any claim, right, or interest for, against, on

behalf of, in, or in the name of Narco Freedom, and all others acting for or on behalf of such

persons including, but not limited to, attorneys, trustees, agents, sheriffs, constables, marshals, and

other officers and their deputies, and their respective attorneys, servants, agent and employees, be

and hereby are stayed from:

      a.      Commencing, prosecuting, continuing, entering or enforcing any suit or

proceeding against Narco Freedom, except that such actions may be filed to

toll any applicable statutes of limitations;

      b.      Commencing, prosecuting, continuing, entering or enforcing any suit or

proceeding in the name of or on behalf of Narco Freedom;

      c.      Accelerating the due date of any obligation or claimed obligation; filing

or enforcing any lien; taking or attempting to take possession, custody,

or control of any asset of Narco Freedom; attempting to foreclose,

forfeit, alter, or terminate any of Narco Freedom's interest in any asset,

including without limitation, the establishment, granting, or perfection

of any security interest, whether such acts are part of a judicial

proceeding, are acts of self-help, or otherwise;

   d.     Using self-help, executing, issuing, serving, or causing the execution,

          issuance or service of, any legal process including, but not limited to,

          attachments, garnishments, subpoenas, writs of replevin, writs of execution,

          or any other form of process whether specified in this Order or not for the

          purpose of impounding or taking possession of or interfering with, or

          creating or enforcing a lien upon, any assets of any of Narco Freedom or the

          Receiver or any agent or representative appointed by said Receiver; or

   e.     Taking any action or doing anything whatsoever to interfere with the

          Receiver taking custody, control, possession, or management of Narco

          Freedom's assets or documents, or to interfere in any way with the

          Receiver, or to harass or interfere with the duties of the Receiver, or to

          interfere in any manner with the exclusive jurisdiction of this Court over the

          assets or documents of Narco Freedom.

(the "Temporary Injunction").

   10.    Nothing in this Order, including the Temporary Injunction described in the

preceding paragraph, shall in any way apply to or affect any right, remedy, action, activity or

conduct of the Government, or any of its agencies, departments, employees, or agents, with respect

to Narco Freedom, the Receiver or any other person or entity. Specifically, but without limitation,

the Temporary Injunction shall not stay:

   a.     Any action by the Government or the State of New York;

   b.     The commencement or continuation of a criminal action or

          proceeding;

   c.     The commencement or continuation of an action or proceeding by a

governmental unit to enforce such governmental unit's police or

regulatory power including, but not limited to, the pending case;

d.      The enforcement of a judgment, other than a money judgment,

obtained in an action or proceeding by a governmental unit to enforce

such governmental unit's police or regulatory power;

e.      The commencement of any action by the Secretary of the United

States Department of Housing and Urban Development to foreclose a

mortgage or deed of trust in any case in which the mortgage or deed of

trust held by the Secretary is insured or was formerly insured under

the National Housing Act and covers property, or combinations of

property, consisting of five or more living units; or

f.      The issuance of a notice of tax deficiency.

11.    Any party in interest may apply to the Court for relief from the Temporary

Injunction.

### IV.   COMPENSATION

12.    Compensation for the Receiver through June 2015 shall be as follows:

a.      For the month of April 2015, the lesser of: (i) $35,000.00; and (ii)

$550.00 per hour times hours worked.

b.      For each of the months of May 2015 and June 2015, the lesser of: (i)

$45,000.00; and (ii) 550.00 per hour times hours worked.

c.      The Receiver shall also be entitled to reimbursement for

out-of-pocket expenses.

d.      Compensation of the Receiver after June 30, 2015 (if the Receiver is

still in place) will be addressed prior to June 30, 2015.

13.     The Receiver shall provide a monthly invoice to the United States Attorney's Office for its review and consent and, thereafter, seek Court approval for the monthly compensation.

14.     Compensation for Garfunkel Wild, P.C. ("GW") shall be as follows:

    a.     For the month of April 2015, the lesser of: (i) $50,000.00; and (ii) hourly rates times hours worked.

    b.     For each of the months of May 2015 and June 2015, the lesser of: (i) $100,000.00; and (b) hourly rates times hours worked.

    c.     GW shall also be entitled to reimbursement for out-of-pocket expenses.

    d.     Compensation for GW after June 30, 2015 (if the Receiver is still in place) will be addressed prior to June 30, 2015.

15.     GW shall provide the Receiver with a detailed monthly invoice and, upon approval by the Receiver, shall provide the United States Attorney's Office with the invoice for its review and consent. GW shall thereafter seek Court approval of the monthly compensation.

16.     Except as otherwise provided by an Order of the Court, the Receiver is authorized to pay Professionals whose fees (exclusive of disbursements) are less than $10,000.00 in the ordinary course.

17.     The Receiver shall promptly segregate in a separate account $500,000.00, *which funds shall be designated and used solely to pay the fees and expenses of the Receiver* and GW. Professionals rendering services in the ordinary course may be paid out of other

Narco Freedom assets or, if the Receiver deems appropriate, from the $500,000.00 of designated funds.

## V.    MISCELLANEOUS

18.    Narco Freedom shall pay costs, fees, and expenses at a reasonable rate incurred in connection with the performance of the Receiver's duties described in this Order, including the costs and expenses of those persons who may be engaged or employed by the Receiver to assist her in carrying out her duties and obligations, provided that before incurring expenses in excess of $10,000.00 for the hiring of outside agents the Receiver will seek Court approval. The Receiver may promptly advise the Court of any issues relating to funding that may result in nonpayment of the Receiver's costs, fees and expenses.

19.    The Receiver should provide a status report to the Court approximately every thirty (30) days.

20.    The Receiver should make appropriate arrangements for the uninterrupted payment of Narco Freedom's payroll (for current working employees who are actually working for Narco Freedom) consistent with law and regulations so long as it is financially feasible.

21.    The Receiver shall not be deemed to be a sponsoring employer, plan fiduciary, trustee, responsible person or other party in interest with regard to any Narco Freedom retirement or employee health or welfare benefit plan maintained for Narco Freedom former or current employees, whether covered under the Employment Retirement Income Security Act or otherwise or whether tax-qualified or otherwise.

22.    This Order is without prejudice to the ability of Narco Freedom to continue its present action in the New York State Supreme Court, Bronx County, for an order enjoining its exclusion from the New York State Medicaid Program.

23.     Nothing in this Order has any effect on the responsibility of Narco Freedom's insurance carrier to pay accrued and future legal fees and expenses.

24.     The sole member of Narco Freedom, who is not a party in this action, may file with the Court any objections to the receivership terms.

25.     It is further ordered that by 3:00 p.m. on April 6, 2015 Narco Freedom shall identify to the Receiver all of its bank or other financial accounts. Within forty-eight hours of entry of this Order, Narco Freedom shall provide the Receiver a detailed report of all assets exceeding $5,000 in value, necessary information regarding the next payroll date and processor, weekend and weekday contact information of key employees who can provide updated and necessary operational information, and information regarding any urgent matters that require imminent information.

SO ORDERED.

_____
John G. Koeltl
United States District Judge

Dated: New York, New York
        May 20, 2015

**EXHIBIT B**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 12/18/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

UNITED STATES OF AMERICA,

    Plaintiff,

   -against-        14 Cv. 8593 (JGK)

NARCO FREEDOM, INC.,

    Defendant.

-------------------------------------------------------------x

### ORDER GRANTING TEMPORARY RECEIVER'S MOTION FOR (A) AUTHORITY TO FILE A PETITION FOR NARCO FREEDOM, INC. UNDER TITLE 11 OF THE UNITED STATES CODE AND (B) RELATED RELIEF

   Upon the motion (the "Motion") of Lori Lapin Jones, in her capacity as temporary receiver (the "Temporary Receiver") for Narco Freedom, Inc. ("Narco"), by her counsel, Garfunkel Wild, P.C., dated November 23, 2015, for entry of an Order authorizing the Temporary Receiver to file a petition for Narco under Title 11 of the United States Code (the "Bankruptcy Code") and granting other related relief, as more fully set forth in the Motion [Doc No. 350]; and upon review of all papers submitted and the entire record of this case; and upon a hearing on the Motion having been held on December 7, 2015; and the Court having concluded that the relief sought by the Temporary Receiver in the Motion is necessary, appropriate and in the best interests of Narco.

### NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

   1.  The relief sought in the Motion is hereby granted as set forth herein.

   2.  The Temporary Receiver is hereby authorized to file a petition for Narco under the Bankruptcy Code (a "Bankruptcy Case") and to take such action the Temporary Receiver deems necessary to prosecute a Bankruptcy Case and preserve Narco's estate.

   3.  Subsequent to the filing of any Bankruptcy Case, the Temporary Receiver is hereby authorized to remain in control, and exercise all rights and authority granted under the Amended Receiver Order, with respect to Narco and all of its assets, including

any and all cash accounts, subject to the provisions of the Bankruptcy Code and further Order of the Bankruptcy Court or, as set forth in paragraph 6, further Order of this Court.

4.   The Executive Reserve Account, as defined in the Motion, and which is being held by the Temporary Receiver in a segregated account shall remain segregated from other Narco funds and shall not be ~~dispersed~~ *disbursed* without further Order of the Bankruptcy Court on notice to the former executives, the United States of America ("Government") and New York State and an opportunity to be heard.

5.   The Fee Account, as defined in the Motion, and which is being held by the Temporary Receiver in a segregated account shall remain in a segregated account at Narco's current bank, shall remain under the control of the Temporary Receiver and funds in the Fee Account shall not be ~~dispersed~~ *disbursed* without further Order of this Court or the Bankruptcy Court, as set forth in paragraph 6.

6.   The Temporary Receiver is hereby authorized to fund the Fee Account in an amount of $200,000 for the fees and expenses of the Temporary Receiver and Garfunkel Wild, P.C. for January 2016, bankruptcy filing fees, tail insurance costs, and unpaid fees and expenses of Wenig Saltiel, LLP and Smith & Downey, P.A. Unpaid fees and expenses of the Temporary Receiver and Garfunkel Wild, P.C. (a) for the period through the date of the filing of the Bankruptcy Case and/or (b) relating to the discharge of the Temporary Receiver shall remain subject to approval of this Court on notice to the Government.  Fees and expenses of the Temporary Receiver and Garfunkel Wild, P.C. incurred after the filing of the Bankruptcy Case (and that do not relate to the discharge of the Temporary Receiver) shall be subject to approval of the Bankruptcy Court. Unpaid fees and expenses of Wenig Saltiel, LLP and Smith Downey, P.A. incurred through the date of the filing of the Bankruptcy Case ~~and that are in excess of caps approved by this Court~~ shall remain subject to approval of this Court and any post-Bankruptcy Case fees and expenses shall be subject to approval of the Bankruptcy Court.

7.     Within 45 days of the filing of the Bankruptcy Case (or as such time period may
be extended by this Court), the Temporary Receiver shall file an application with this Court to be
discharged as Temporary Receiver and for related relief.

Dated: New York, New York
December 18, 2015

John G. Koeltl
United States District Judge